## THE BENJAMIN WILLIAMS.

### UNITED STATES v. NEW ENGLAND COAL & COKE CO. et al.

### No. 1032.

District Court, D. Massachusetts.
Sept. 18, 1947.

William T. McCarthy, U. S. Atty., and Gerald J. McCarthy, Asst. U. S. Atty., both of Boston, Mass., for libelant.

Joseph P. Sullivan, Hurlburt, Jones, Hall & Bickford and Francis P. Garland, all of Boston, Mass., for Mystic Terminal Co., impleaded respondent.

Bingham, Dana & Gould and Albert T. Gould, both of Boston, Mass., for respondent.

FORD, District Judge.

This is a libel filed by the United States as owner of the S. S. Benjamin Williams seeking to recover for damage alleged to have been done to the vessel on or about October 19, 1942, while under charter to the respondent New England Coal & Coke Company (hereinafter called the Coal Company). The charterer duly impleaded a public wharfinger, the Mystic Terminal Company (hereinafter called Terminal), on the ground that if there was any damage it was caused by Terminal in discharging a cargo of coal.

It appears from the pleadings that the charter party entered into between the petitioner and respondent contained the following: "Cargo to be loaded and discharged free of any expense to the vessel, except the vessel is to pay the customary dumping and/or trimming charges at loading port." The charterer contends that if there is any liability on its part, it should be shifted to the stevedore Terminal.

Terminal in its answer admits it unloaded the Benjamin Williams at Boston on October 19 and 20, 1942, in accordance with a contract between it and the charterer. It further alleges that only slight unavoidable damage was done to the steamship due to the light manner in which the vessel was constructed and that at no time did it cause damage to the vessel through is negligence in unloading.

### The Facts.

The S. S. Benjamin Williams, a liberty type ship, was commissioned and delivered to the operators on October 4, 1942. On October 10 the petitioner chartered the vessel to the Coal Company for its maiden voyage, from Norfolk, Virginia, to Boston. A cargo of coal was loaded at Norfolk on October 13 and the ship proceeded to Boston, arriving at the dock of Terminal on October 19.

Arrangements were made with Terminal for the discharge of the cargo. Under the agreement the entire operation of discharging was conducted by Terminal and payment for the service was made in accordance with published rates. The rate paid by the Coal Company was substantially higher than that charged for the unloading of a coal collier, because the S.S. Benjamin Williams is a tween deck vessel.

The process of unloading began at 3 p. m. on the afternoon of the 19th and continued until 11 p. m. It was resumed at 8 a. m. of the 20th and completed at 11 p. m. that night. At 10 a. m. of the 21st, the vessel left without cargo for New York, where it arrived on the 23rd at the Erie Basin, Brooklyn. There, on the following day, a survey was conducted by Merton R. Clancy, surveyor of the United States Salvage As-

sociation, Inc., of damage done to the vessel during the unloading in Boston. The surveyor held a Chief Engineer's license and had served as surveyor with the United States Salvage Association, Inc., for 2½ years, making at least 2,000 surveys. Many of the latter were made on Liberty ships. There was no question as to his competency. Witness Clancy made an extensive report, which was admitted in evidence, dated November 4, 1942, in which the items of damage were set out with particularity together with recommendations as to the manner in which the repairing was to be done. There were thirty-three items of damage [1] involving pipe casing brackets, trucking plates, tank tops, ladders, ceiling boards and cargo battens of the ship. There was a statement in the report that Captain D. L. Madison of the Benjamin Williams reported that this damage was caused by dropping large buckets on the parts damaged. Clancy estimated the cost of repairs to be $13,950 of which the sum of $691 was actually spent to make repairs.

Captain Nils Asplund, Chief Mate of the Benjamin Williams, testified that the Benjamin Williams was a normal general cargo ship whose tank tops were covered only in the square of the hatch by approximately two or three-inch boards. He stated that unlike coal-carrying colliers there was no

[1] No. 2 Lower Hold—Starboard Side

1. One wood pipe covering batten in way of bilge boards, broken.

No. 2 Lower Hold—Port Side

2. Seven pipe casing brackets in way of bilge boards, bent.

3. Eight wood pipe casing battens in way of bilge boards, broken.

4. Forward ladder from lower hold to tween deck—three rungs bent and two indentations in side angles.

5. After ladder from lower hold to tween decks, one rung bent and three indentations in side angles.

No. 3 Lower Hold—Starboard Side

6. One pipe casing bracket bent.

7. One wood pipe casing batten in way of bilge boards, broken.

8. One rung, forward ladder, from lower hold to tween deck, bent.

9. After ladder, from lower hold to tween deck, three rungs, bent; three indentations in side angles.

No. 4 Lower Hold—Port Side

10. After ladder, from lower hold to tween decks, one rung bent.

11. No. 2 port and starboard double bottom tanks tops, indented in several places.

No. 2 Lower Hold—Starboard Side

12. Second strake—inboard—second and third tank tops plates from after bulkhead, set down in several places.

13. Third strake—inboard—second and third plates from after bulkhead, set down in several places.

14. Fore and aft trucking plates set down in several places.

No. 2 Lower Hold—Port Side

15. Third strake—inboard—first, second and third tank top plates from after bulkhead, set down in several places.

16. Second strake—inboard—second and third tank top plates from after bulkhead, set down in several places.

17. Fore and aft trucking plates set down in several places.

18. Ceiling boards in way of hatch opening, heaving scored.

No. 3 Lower Hold—Port Side

19. Second strake—inboard—second and third tank top plates from after bulkhead, set down in several places.

20. Third strake—inboard—second and third tank top plates from after bulkhead, set down in several places.

21. Fore and aft trucking plates set down in several places.

No. 3 Lower Hold—Starboard Side

22. Third strake—inboard—second tank top plate from after bulkhead, set down in several places.

23. Second strake—inboard—first tank top plate from after bulkhead, set down in several places.

24. Fore and after trucking plates set down in several places.

25. Ceiling boards in way of hatch opening heavily scored.

No. 4 Lower Hold—Port Side

26. Second strake—inboard—first tank top plate from forward bulkhead, set down in several places.

27. Third strake—inboard—first tank top plate from forward bulkhead, set down in several places.

28. Fore and after trucking plates set down in several places.

29. Ceiling boards in way of hatch opening, heavily scored.

30. Shaft alley trunk indented in four places.

No. 4 Lower Hold—Starboard Side

31. Third strake—inboard—first tank top plate from forward bulkhead, set down in several places.

32. Fore and after trucking plates set down in several places.

33. Ceiling boards in way of hatch opening, heavily scored.

covering over the tank tops in the wings of the vessel. He testified that four-ton clam shell buckets were used in the unloading. These buckets were suspended from three cranes on the dock. The latter extended about seventy feet above the deck of the vessel. The vessel had five hatches, two were empty, and the remaining three hatches were used to load the coal and, in the unloading, one clam shell bucket was operating in each hold at the same time. Captain Asplund testified, and I find all his testimony to be true, that he notified the hatch foreman employed by Terminal while the unloading was proceeding that the vessel was a Liberty type ship and lightly constructed and "any damage that he would probably do to the ship would show up." On the afternoon of the 20th, he stated he heard "the bucket being dumped heavily in the hold" and he cautioned the crane operator of No. 2 hold. This happened, he testified, ten or fifteen times. On that day the Chief Mate went to Terminal's office and made a written report to Mr. James J. Brennan, general foreman of Terminal, of damage to the ship caused by Terminal. An entry in the vessel's log reflected this fact. In substance, the report, also signed by Brennan as the "representative of party causing damage", stated the damage was to the "Hatch-combings, Flooring, Ladders, Swetbattens, #2, #3, #4 hatch. Tunnel #4." The extent of damage was described as "Apparent (sic) damage slight and unavoidable." This was inserted in the report at Mr. Brennan's suggestion. The latter refused to sign without that statement. It was stated in the report that damage occurred "By buckets discharging". The Chief Mate also stated in his deposition that he could not determine the extent of the damage at the time he signed the report because of the presence of coal in the holds. No damage of any sort was done in the holds after the vessel left Boston as no work was going on. Asplund also testified the vessel was a brand new ship and the cargo was the first it carried. The Chief Mate was allowed to testify without objection that a Liberty ship carrying coal could be unloaded without damage if the buckets were handled "very" carefully and the damage to the tank tops that he observed on the way back to New York was not due to reasonable wear and tear and could have been "avoided by careful handling of the buckets".

On cross examination the Chief Mate testified he observed that "when we got down to the bottom, the trimmers were trimming coal in piles alongside the covering in the square of the hatch and they swung the buckets by a wire that was manipulating the buckets to get the swing on the bucket into the sides of the hold and dumped the bucket on top of the pile that the trimmers had made." This was that part of the hold where there was no protection over the tank tops as there was in the square of the hold. The witness stated it was on either side of the wooden ceiling over the tank tops under the square of the hatch that he observed the damage. In cross examination the Chief Mate testified, and I find as a fact, that he complained to general foreman Brennan that No. 2 crane operator was careless and the foreman shifted the operator of No. 4 crane to No. 2 crane when No. 4 hold was emptied. He further stated that some of the damage he observed occurred in No. 2 hold where crane #2 was operating.

Witness Merton R. Clancy, the surveyor, stated in his report, that the damage to the ladders and a small percentage of the damaged ceiling boards could be regarded as reasonable wear and tear. This damage he testified amounted to $450. The remainder of the damage Clancy stated was caused by improper handling of the discharging operation. Mr. Clancy testified further the tank top of the vessel had a thickness of seven-sixteenths of an inch.

The respondent introduced evidence to the effect that the grab buckets used to unload the coal could not be swung very far into the wings of a tween deck ship because the wire rope that causes the grab comes right up against the tween deck combing and thus would not let the grab get in very far. The hatch foreman Cody denied that Chief Mate Asplund made any complaint to him with respect to the manner of unloading the ship. I find to the contrary. General foreman Brennan denied Asplund made complaint to him as to the manner of discharging the ship. This witness testified he saw only slight damage to the vessel such as wear on the combings

from the falls and damage to one swetbatten which he attributed to wear and tear. He admitted he signed the report of damage by Chief Mate Asplund reflecting damage to hatchcombings, ladders, and swetbattens in #2, #3, and #4 hatches. Witness Brennan also testified that the buckets were swung at times outside the square of the hatch into the wings. He stated further that the men could only push the grab four or five feet into the wings.

At the conclusion of the testimony, the court continued the hearing in order that Surveyor Clancy, who made the survey October 24 at Erie Basin, Brooklyn, might testify in person. At the continued hearing Mr. Clancy testified that he made a thorough search of the vessel and included in his survey only the major indentations, e. g., those of more than one-half inch in depth. He further stated that the indentations he took into account in making his estimates were, in the main, from one to four inches in depth and extended in some cases over areas one and two feet square. In cross examination he testified some of the indentations were sloping and others very sharp and the indentations would not be present unless the buckets were laid down "hard and rough".

## Conclusions.

I find the facts as testified to both by Chief Mate Asplund and Surveyor Clancy to be true.

█ It is not disputed that the Benjamin Williams was a brand new ship when it arrived at Terminal for unloading. There was no evidence that between the unloading and the survey any damage was caused by third parties. Whatever damage was done to the vessel was caused by Terminal in unloading the ship and most of it was not unavoidable. The evidence shows the damage for the most part was caused by the negligence of Terminal. The grab buckets and grabs were negligently handled by Terminal's agents. No other conclusion is possible in the light of all the testimony. The grab buckets were landed with more than reasonable force on the ceilings above the tank tops within the square of the hatch and the damage to the tank top plates outside the square of the hatch was caused by al-

lowing the grab to swing outside the square of the hatch into the wings and light with unreasonable force on the tank tops. The agents of Terminal knew the construction of the Benjamin Williams and should, as reasonable men, have taken this into account in their use of the heavy unloading buckets. Careless handling of the grabs, also caused the other damage to the vessel that the surveyor found. The evidence of the general foreman that little damage was done, in the light of the survey, is not credible. Nor is there any doubt in my mind that the damage caused is that reflected in items 1–33 set forth by the report of the surveyor.

There remains the question: What damage is attributable to Terminal's negligence and what can be charged off as ordinary wear and tear? Judge Brewster stated in his unreported opinion of June 11, 1932, in the case of Gorman Leonard Coal Co. v. Peninsular State S.S. Corp., affirmed 1 Cir., 66 F.2d 83, which involved a suit for damage sustained by a vessel while discharging coal at the dock of the same defendant here: "Undoubtedly, some damage is unavoidable when heavy grabs, or diggers, are used. This damage the vessel must assume as ordinary wear and tear incident to the operation of discharging her cargo. The Terminal Company undertook to unload the cargo from a vessel constructed quite differently from the ordinary collier, in which large grabs could be used with little risk of damage to the vessel." It used heavy grabs there as was done here. Judge Brewster went on to say: "To whatever extent these two conditions added to the degree of care which the occasion demanded, when measured by the test of reasonableness, the Terminal Company must be held to have assumed the responsibility of exercising that extraordinary care, and failure to meet that responsibility must be held to be negligence." See Gorman Leonard Coal Co. v. Peninsular State S.S.Corp., supra, 66 F.2d 83. The facts in the case cited with respect to heavy grab buckets and lightly constructed ships are identical with the facts here and what Judge Brewster stated applies in this case.

█ As the surveyor testified with respect to items 3, 18, 25, and 33, the dam-

age to some of the ceiling boards and some damage to ladders reflected in items 4, 5, 8, 9, and 10 may be attributed to reasonable wear and tear and I so find. His estimate of this damage was $450. The remainder of the items of damage and that reflected in the "Notes" set out in Surveyor Clancy's report the court concludes were caused by the negligence of the respondent in the use of the heavy grab buckets and grabs. Terminal is primarily responsible for this damage and the Coal Company secondarily liable.

The case is referred to a Commissioner for the assessment of damages.